UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 20-10017-LTS |
| ) | |
| TYKEI HALLMAN, ) | |
| ) | |
| Defendant. ) | |

SECOND MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS (DOC. NO. 68)

October 5, 2021

SOROKIN, J.

On January 23, 2020, a grand jury returned an indictment charging Tykei Hallman with

robbery and a related firearms offense.  Hallman has moved to suppress evidence derived from a

search of his cell-site location information ("CSLI").  After briefing and a non-evidentiary

hearing, in an Order issued May 14, 2021 ("the May Order"), the Court found that the four

corners of the search warrant application established probable cause for the warrant to issue, but

that Hallman had advanced sufficient evidence to require a hearing pursuant to Franks v.

Delaware, 438 U.S. 154 (1978).  Doc. No. 92.[1]  That hearing occurred on June 7, 2021, with

further argument on June 9 and August 16, 2021.  Doc. Nos. 97, 98, 108.  After careful review of

the record, the Court VACATES its earlier finding of probable cause and ALLOWS the Motion

to Suppress (Doc. No. 68).

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing
system; pincites are to the page numbers in the ECF header.

I.      BACKGROUND

A.  The Investigation

On August 30, 2018, around 8:14 p.m., a masked man wearing dark clothing entered a

Mobil Gas Station in Hyde Park, Massachusetts.  Doc. No. 87-4 ¶¶ 20, 20(a).  Brandishing a

black and silver handgun, the man demanded money from the cashier and fled with

approximately $200 in cash.  Id.  Over the next ten months, more gas stations and convenience

stores were robbed.  Id. ¶ 20(b)-(r).  In July 2019, the FBI issued a press release seeking the

public's assistance in identifying "the 'Inconvenient Crook'": a single male suspect they believed

was responsible for nine "commercial robberies . . . from August 2018 through March 2019."

Doc. No. 87-1 at 1.  The FBI described the suspect as "likely in his 20s to 30s," noting that, "in

some of the robberies, [he] walked with a distinctive limp."  Id.  Information about the robberies,

including surveillance photos and video, was made available to the public.  Id. at 1-2.  However,

the spree continued.

On August 29, 2019, the government sought a search warrant requiring Google to

identify smartphones that were in the vicinity of the robberies.  The application for the warrant

("the August application") reported that eighteen establishments in Hyde Park and nearby towns

had been robbed between August 2018 and August 2019.  Doc. No. 87-4 ¶ 20(a)-(r).  On every

occasion, the robber wore dark clothing and a mask, and he nearly always brandished a handgun.

Twice, witnesses or local investigators said the robber had a distinctive gait.  See id. ¶ 20(c), (i)

(describing "a distinct limp" and a "funny run").  In its sworn filing, the government explained

that all eighteen robberies listed in the submission were "believed to have been perpetrated by

the same individual," and that this individual was "male."  Id. ¶ 20.  All nine robberies described

in the FBI's July press release appeared in the August application.  Compare Doc. No. 87-1 at 2,

with Doc. No. 87-4 ¶ 20(a)-(i).  The August application included nine more robberies, eight of which occurred after the FBI issued its press release.

The Court approved the government's application the day it was made and issued the warrant.  Despite the warrant's command, Google did not produce the requested data in 2019.  For its part, the government failed to return to the Court to seek an order compelling or expediting Google's compliance with the warrant.  Meanwhile, six more robberies occurred.  Doc. No. 68-1 ¶ 20(j)-(o).  On November 29, 2019, still lacking the data from Google (and having sought no intervention from the Court in this regard), the government applied for another search warrant ("the November application").

In the November application, the government sought historical CSLI for phones used and possessed by two men—Hallman and his brother, Bernachi Dismond—for the prior seven months, and prospective location data for the same two phones for the next thirty days.  Id. at 33.  The November application incorporated the last nine robberies listed in the August application, along with the six robberies that had occurred in the intervening months.  One of those was the November 5, 2019 robbery of the Five Corners Market in Quincy—the only robbery the government has charged Hallman with committing and the subject of this criminal case.

The affiant for both the August and November applications was the same FBI Special Agent ("the Agent"), who prepared the necessary paperwork under the guidance of the Assistant United States Attorney ("AUSA") assigned to this case.  Echoing the August application, the government's sworn filing once again represented that "[t]he robbery Suspect . . . appears to be the same person" for each of the fifteen robberies described in the November application.  Id. ¶ 7.  It explained: "Investigators believe the Suspect to be the same person based on a consistent appearance based on both video surveillance and witness statements."  Id.  Next, it described this

single "Suspect" as "a male [who] always wore a dark hooded outer-garment, a mask/bandana, and carried a black and silver handgun," further specifying that this male "in all the robberies has the same build."  Id.

The government provided no further description of the suspect in the November application.  It neither generally nor specifically described the person's height or build.  It did not describe the person's race, eye color, or gait.  Despite stating that "in all the robberies" the suspect had "issued verbal demands for money," the government did not describe the person's voice or recount the words he used.  The only descriptive information provided, besides that quoted above, appears in the subparagraphs regarding the fifteen listed robberies and is limited to the clothing worn by the suspect during the crimes.  See id. ¶ 7(a)-(o) (describing in many incidents a dark mask, a dark sweatshirt, dark pants, gloves, and red-and-black sneakers).[2]

In support of its request for access to Hallman's CSLI, the government cited facts which it suggested connected Hallman to the robberies.  In particular, Hallman is male.  He was seen during surveillance "wearing black and red sneakers consistent with sneakers worn during multiple armed robberies."  Id. ¶ 18.  He lives with Dismond, whom the government described (without elaboration) as a suspect in another armed robbery, and who had access to the vehicle investigators believed had been the getaway car for the charged robbery.  Id. ¶¶ 14, 16, 18.  The government described Dismond, observed during surveillance, as a "black male, tall, thin, wearing a dark colored hoodie, dark colored pants, and dark colored sneakers."  Id. ¶ 14.  It described Hallman as a male who is "black, approximately 6'5", and thin"—"taller and skinner

---

[2] None of these features are universal among the listed robberies.  Sometimes the sweatshirt is described as a hoodie.  The gloves are often described as gray.  The pants are in some instances described as having a white logo on one leg.  Sometimes the sneakers are described only as black, and in a few instances the suspect's footwear is not mentioned at all.

than" Dismond.  Id. ¶ 18.  This section of the application concludes with the following opinion:

"Based on overall appearance consistent with the Suspect described in above paragraph 7(a-o),

Hallman is believed to be involved in the aforementioned armed robberies."  Id. ¶ 19.  The Court

has examined this crucial sentence ("Paragraph 19") before, Doc. No. 92 at 6, 8-9, and it will

return to it again in the discussion that follows.

A magistrate judge approved the November application the day it was made and issued

the requested warrants.  This magistrate judge was not the same one who had reviewed and

approved the August application, apparently because the November application was submitted

over a holiday weekend.[3]  The November application omitted: (a) any reference to the existence

of the August application; (b) any reference to or description of the first nine robberies listed in

the August application; and (c) any reference to witness descriptions of the suspect's verbal

demands or physical characteristics, such as his gait, despite the August application having

included such information.  The November application neither acknowledged nor explained any

of these omissions.

Relying on the information it obtained in response to the November warrants, the

government secured a criminal complaint against Hallman and a December 2019 warrant to

search his home.  In the pending motion, Hallman challenges the November warrant for his CSLI

and seeks to suppress: 1) the information obtained in response to that warrant; and 2) the

---

[3] Though the Local Magistrate Rules do not expressly so provide, the long-standing practice in
this District is that the government may present a search warrant application to the emergency
Magistrate Judge if the Magistrate Judge who reviewed earlier applications in the same case is
unavailable at the time of the subsequent application.  Cf. D. Mass. L. Mag. R. 15(d)(1).

evidence discovered during the subsequent search of his home, which he argues is tainted by the earlier unlawful search.[4]  Doc. No. 68 at 1, 25.

    B.  <u>The Government's Response to Hallman's Motion</u>

    In its memorandum opposing Hallman's motion, the government stated that, at the time of the November application, the Agent "had established" that Hallman "matched the build of the suspect in the pattern robberies," and that Hallman (along with Dismond) was "connected to" the car investigators believed had been used during the charged robbery.  Doc. No. 80 at 9, 11. The government urged that the affidavit conveyed the Agent's "determin[ation] that" Hallman had "a similar height and weight" to "the suspect in each of the robberies."  <u>Id.</u> at 10.  The government characterized Hallman's height as a "highly distinguishing" feature "determinative to the probable cause analysis," citing Census Bureau data and suggesting "the unusual height of the suspected robber[] vastly shrunk the pool of possible suspects."[5]  <u>Id.</u> at 10-11.

    At the April 15, 2021 motion hearing, the government represented that the AUSA (not the Agent) had "crafted" the affidavit supporting the November application.  Doc. No. 89 at 18, 20, 67; <u>see also, e.g.</u>, <u>id.</u> at 8 (reflecting AUSA's reference to "my affidavit," and to things "I did not list").  Addressing the substance of the motion, the government unequivocally agreed that the Court should read Paragraph 19 as "the agent . . . saying that, in his opinion, Hallman is the robber," and that the agent's opinion arose from his belief that Hallman matched "the appearance

_____

[4] According to the government, the search of Hallman's home led to the seizure of various items of clothing "believed to [have been] used . . . during the robberies," including "dark jackets, dark hooded sweatshirts, black sneakers with red highlights, multiple pairs of gray and black gloves, and a black ski hat with a face cut out."  Doc. No. 80 at 2.  Testimony at Hallman's preliminary hearing suggests a firearm—but not the handgun used in the robberies—also was recovered from the home.  Doc. No. 18 at 15.
[5] At the hearing on Hallman's motion, the government conceded that this Census data was neither summarized nor cited in the November application.  Doc. No. 89 at 22.

of the robber . . . based on . . . height, weight, build, and gender." Id. at 18-20.  Echoing its memorandum, the government described Hallman as "distinctively tall" and urged that "the same person at every robbery had the same [distinctively tall] height." Id. at 20.  When asked to identify facts connecting Hallman directly to the car used in the robbery, the government conceded that the affidavit contained no such facts.  See id. at 25 (agreeing the affidavit placed Dismond in the car and separately linked Hallman to Dismond).

In the May Order, this Court adopted the view of the affidavit espoused by the government in its papers and at the motion hearing.  As the Court explained then, it perceived only three "facts" in the statements preceding Paragraph 19 "connecting Hallman to the Suspect": "(1) both are male; (2) both occasionally wear red/black sneakers; and (3) Hallman lives with his brother Dismond, who is connected to the vehicle used in the [charged] robbery." Doc. No. 92 at 5.  Those facts, without more, were "slender evidence upon which to base a finding of probable cause" supporting a request seeking Hallman's CSLI.  Id. at 6.  Thus, the Court's assessment of Hallman's challenge to the warrant turned on Paragraph 19 and the inferences a person of reasonable caution would draw from it in the context of the November application.  The Court quoted the critical language and analyzed it as follows:

> Paragraphs 7(a-o) of the affidavit do not . . . include any distinctive information regarding the Suspect, they only describe the Suspect as wearing nondescript clothing and make no mention of other characteristics, such as the Suspect's race, height, or build.  Nor are any such characteristics belonging to the Suspect described elsewhere in the affidavit.  The meaning of [Paragraph 19] is thus somewhat unclear but, when read in context and when all due deference is granted to the magistrate judge's determination, the Court reads the affiant as stating that Hallman's "general appearance" (as described in the affidavit) is consistent with that of the Suspect in each of the robberies detailed in Paragraphs 7(a-o).  Thus, the reader can infer, among other things, that the Suspect is 6'5" in height with a thin build.

Id. (citation omitted).  The Court then summarized the allegations tying Hallman to the suspect as the three previously noted, plus the fact that "Hallman is 6'5" in height with a thin build" and

7

"matches the height and build of the Suspect in each and every one of the fifteen robberies" (a fact derived from Paragraph 19, as government said it should be understood).  Id.

In short, the Court reasonably read the somewhat opaque language of Paragraph 19 as saying Hallman's distinctly tall height of 6'5" matched that of the suspect.  This was the reading of the language urged by the government.  Doc. No. 89 at 20, 22, 39-40.  And, this reading, as the government itself recognized, was required in order to find probable cause as the Magistrate Judge did when authorizing the warrant.[6]  See Doc. No. 80 at 10-11 (calling Hallman's height "determinative to the probable cause analysis"); Doc. No. 89 at 17 (agreeing the application would not establish a nexus between Hallman and the robberies if "paragraph [19] weren't in the affidavit").

However, this reading was wrong.  At the June 7, 2021 Franks hearing, candid testimony by the Agent established the interpretation advocated by the government, adopted by the Court, and critical to the Magistrate Judge's conclusion misrepresented the facts.  On both direct and cross-examination, the Agent testified that he was neither able nor qualified to "ascertain" or "quantify height"—including the height of the suspect—from video surveillance.  Doc. No. 113 at 38-39, 107-09.  In line with that testimony, the Agent at no time characterized Hallman's height as "matching" that of the suspect, nor did he describe it as "unique," "distinctive," or otherwise "determinative" in his own probable cause analysis, including when asked to provide the factual basis for his conclusion that Hallman's "appearance [was] consistent" with that of the suspect.

---

[6] This was not the only time that the government invited the Court to base a ruling in this case on the Suspect's height and the link that fact provided to Hallman.  See Doc. No. 18 at 6, 7, 12, 19 (reflecting preliminary hearing testimony by a different agent citing robber's height using phrases such as "very tall" and "extremely tall" and estimating Hallman was 6'5" or 6'6").

Instead, the Agent cited "the investigation in the aggregate" and identified the following facts as having contributed to the determination expressed in Paragraph 19 connecting Hallman and the suspect in terms of "overall appearance":  1) the connection between Dismond and the car used in the charged robbery; 2) records showing that Dismond had phone contact with the person having control of the car on the day of the charged robbery; 3) observations of Hallman coming and going from the location where he resided with Dismond; 4) observations of Hallman wearing "black and red shoes" and dark clothing;[7] and 5) Hallman's "overall physical stature, in terms of his build."  Id. at 109-14.[8]  Though the Agent said "overall appearance included height," he reiterated his inability to assess height based on video footage.  Id. at 112-14.  He went further, clarifying in an exchange with the Court that, in Paragraph 19, he was "not saying [Hallman is] 6'5" and the robber is 6'5","  but rather that "something about [Hallman's] physical presentation" was "consistent with the robber."  Id. at 114.  Thereafter, the Agent agreed that no additional considerations had factored into the conclusion he expressed in Paragraph 19.[9]  Id.

---

[7] Though the affidavit references observations of Hallman wearing the described shoes and observations of Dismond wearing dark clothing, it does not say investigators ever observed Hallman wearing dark clothing.  Doc. No. 68-1 ¶¶ 14, 18.

[8] The Agent also initially relied on the "difference in physical stature" between Hallman and Dismond, but he described that difference in relatively insignificant terms and conceded under questioning that this fact added little to the probable cause determination.  Doc. No. 113 at 111 (describing Dismond as "a little smaller" and Hallman as "a little taller").

[9] One other aspect of the Agent's testimony at the Franks hearing bears noting.  Paragraph 19 expresses a belief that Hallman was "involved in" the robberies.  Doc. No. 68-1 ¶ 19.  It does not say Hallman "committed the robberies," or "is the Suspect," or "is the person shown in surveillance footage."  The Agent agreed that those statements differed from the words the government used in Paragraph 19.  Doc. No. 113 at 100-02.  Though he said he believed, at the time he signed and submitted the November application, that Hallman was the suspect who had committed each of the listed robberies, he offered no concrete explanation for why he did not simply say so in Paragraph 19.  See id. at 102-06 (noting robberies can involve more than one person, such as a getaway car driver, and saying he believed the language used in Paragraph 19 was accurate when it was written).

The lawyers made their post-hearing argument on June 9, 2021, at which time the government echoed the Agent's testimony that "[h]eight just could not be determined" from surveillance videos, apparently retreating from its prior focus on Hallman's distinctive height. Doc. No. 114 at 5.  The Court then took the matter under advisement.  Id. at 32.  After reviewing the record and considering the manner in which the Agent's testimony about Paragraph 19 differed from the government's pre-hearing argument, the Court's construction, and the Magistrate Judge's conclusion, the Court convened another hearing on August 16, 2021 to entertain further argument on Hallman's motion.  Doc. No. 109.  At that time, the Court identified the following facts as established by the record in this case and material to the probable cause analysis:

- A large number of establishments were robbed in the greater Boston area.

- Investigators believed the same person committed each of the robberies based on the suspect's "consistent" appearance as determined from both video surveillance and witness statements.

- The suspect in each robbery had the same build.

- The suspect was male.

- The suspect always brandished a black and silver handgun.

- The suspect always wore a mask and a dark, hooded outer garment.

- In many robberies, the suspect wore black pants, and occasionally a white logo was noted on the left leg of the suspect's black pants.

- In many robberies, the suspect wore red and black sneakers.

- The robberies in the affidavit span the six months preceding the affidavit.

- Nothing in the affidavit describes the suspect's height, weight, age, race, or eye color.

- On November 5, 2019, the Five Corners Market in Quincy was robbed by the suspect, and a gray sedan frequently driven by a woman named Ashley Cruz was used as the getaway vehicle.

- The next day, Dismond was seen driving the same gray sedan with Cruz.

- Dismond and Cruz communicated by telephone the day of the Five Corners robbery.

- Dismond is a black male, tall, thin, wearing a dark-colored hoodie, dark-colored pants, and dark-colored sneakers.

- Dismond is a previous armed robbery suspect; the affidavit provides no further explanation of this characterization.

- Dismond lives with Hallman, and the two are frequently seen together.

- Hallman is male.

- Hallman is black, approximately 6'5", and thin.

- Hallman is taller and skinnier than Dismond.

- Hallman was observed wearing black and red sneakers consistent with the sneakers worn during the robberies.

- Based on overall appearance, consistent with the suspect described in certain paragraphs, Hallman is believed to be involved in the armed robberies listed in the application.

Id. at 5-7; Doc. No. 68-1 ¶¶ 7, 7(a)-(o), 9-14, 18-20.

The Court then highlighted that it was "tentatively thinking" of reading Paragraph 19 differently than it had in the May Order, citing the Agent's testimony and articulating the following interpretation: "the affiant was stating his belief that Hallman is involved in the robberies based on the totality of the circumstances, including his view that Hallman's 'overall physical stature,' i.e., height, in terms of his build, was something that was consistent with what the agents saw during the course of these armed robberies."  Doc. No. 109 at 7.

The government represented that, "factually," the Court's recitation was "more than accurate in terms of" the evidence, the affidavit, and the testimony.  Id. at 9.  Hallman also agreed that the Court had "accurately summarize[d] the record."  Id. at 14.  The government said it would "scrutinize" the record "in further detail after [the August 16] hearing," id. at 9, and the Court gave the government the two weeks it requested to engage in this review and supplement

11

its argument.  Id. at 23.  At the end of the two weeks, however, the government raised no

objections, suggested no changes or additions, and opted not to further address the Court's

recitation of the facts or the probable cause analysis following from them.  See Doc. No. 111

(declining to present further argument on the motion).  At no point did the government contest

the Court's general proposition that a modification of its earlier reading of Paragraph 19 was

warranted or challenge the specific revision the Court articulated at the August 16 hearing.

## II.  LEGAL STANDARD

To prevail on a motion to suppress brought pursuant to Franks, a defendant must show:

first, that the "warrant application contains false statements or omissions, made intentionally or

with reckless disregard for the truth"; and second, "that a finding of probable cause would not

have been made without those false statements or omissions."  United States v. Arias, 848 F.3d

504, 510-11 (1st Cir. 2017); accord United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015).

Omissions of material facts are treated the same as affirmative falsehoods.  United States v.

Castillo, 287 F.3d 21, 25 (1st Cir. 2002); see United States v. Tate, 524 F.3d 449, 456-57 (4th

Cir. 2008) ("A 'literally true' affidavit . . . can be intentionally misleading if it deliberately

omitted material facts which, when included, would defeat the probable cause showing and thus

render false the original 'literally true' affidavit.").  The First Circuit has found it "helpful" in

some cases "to break the two-prong test" established in Franks "into its three elements," as

follows: (1) "[t]he affidavit need contain a falsehood" or material omission; (2) the falsehood or

omission "must be such that its deletion" or addition, respectively, "would eliminate probable

cause"; and (3) the falsehood or omission "must have been made deliberately, or at least with

reckless disregard for the truth."  Jordan v. Town of Waldoboro, 943 F.3d 532, 541 (1st Cir.

2019).

"Because there is no requirement that every shred of known information be included in a warrant affidavit, the omission of a particular detail, without more, is not enough to satisfy the mens rea element of the Franks test." Id.; see also United States v. Roman, 311 F. Supp. 3d 427, 435 (D. Mass. 2018) ("A mere showing of negligence or innocent mistake . . . is insufficient under Franks to obtain suppression." (quotation marks omitted)).  An omission will, however, satisfy the mens rea element if it is "designed to mislead, or . . . made in reckless disregard of whether it would mislead, the magistrate in his appraisal of the affidavit." Tanguay, 787 F.3d at 49 (quotation marks and brackets omitted).  In the case of allegedly material omissions, recklessness may be inferred where the omitted information was critical to the probable cause determination." Burke v. Town of Walpole, 405 F.3d 66, 81-82 (1st Cir. 2005) (quotation marks omitted); see also Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000) (explaining "omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know" before issuing a warrant).

If a defendant establishes that a warrant application contained intentional or reckless misstatements or omissions, the suppression court "owes no deference to a magistrate's decision to issue an arrest warrant." Burke, 405 F.3d at 82.  "[W]here officers procuring a warrant have deliberately misled the magistrate about relevant information, no magistrate will have made a prior probable cause determination based on the correct version of the material facts." Id. (quotation marks omitted).  As such, the second prong of the Franks analysis requires the Court to consider "whether a more complete and accurate affidavit would have nevertheless supported a finding of probable cause for the search." Jordan, 943 F.3d at 541.  This assessment requires taking "'into account the cumulative effect of . . . multiple omissions' and misstatements," if the

Court finds more than one such problem with the affidavit.  Id. (quoting United States v. Vigeant, 176 F.3d 565 572 n.8 (1st Cir. 1999)).

"An affidavit must provide the" reviewing court "with a substantial basis for determining the existence of probable cause" and, therefore, cannot rely on a "wholly conclusory statement" that the affiant believes evidence of a crime is located at an identified place.  Illinois v. Gates, 462 U.S. 213, 239 (1983).  "Sufficient information must be presented . . . to allow" the reviewing court "to determine probable cause; [its] action cannot be a mere ratification of the bare conclusions of others."  Id.; accord United States v. Brunette, 256 F.3d 14, 17-19 (1st Cir. 2001).

III.    DISCUSSION

In his motion, Hallman cites various statements and omissions in the November warrant application which, he argues, were designed to mislead the Magistrate Judge.  He argues that any fact bearing on the proposition that the robberies were committed by one suspect, or on the link alleged between Hallman and that suspect, is necessarily material—and its omission or misstatement at least recklessly misleading—given the "slender" nature of the information the government offered in support of its probable cause showing.  In response, the government contends it made no material misstatements or omissions, and that the affidavit established probable cause for the search of Hallman's CSLI.

A.  The Government Induced a Misinterpretation of the Affidavit by Misleading the Court Regarding the Meaning of the Paragraph Linking Hallman to the Suspect

The lynchpin of the Court's probable cause analysis in the May Order was its interpretation of Paragraph 19 and the comparison that paragraph draws between Hallman's "overall appearance" and that of the suspect.  The Court read Paragraph 19 to say that the Agent believed, when he signed the affidavit, that both Hallman and the suspect were 6'5" in height with the same thin build.  Doc. No. 92 at 6.  The government's written and oral argument before

the Franks hearing urged the Court to read Paragraph 19 in this way.  Doc. No. 80 at 10-11; Doc. No. 89 at 20, 22, 39-40.  With that specific link (height) between Hallman and the suspect in the mix of facts, and keeping in mind "the deference due to the magistrate judge's determination of probable cause," the Court found "sufficient evidence for a person of reasonable caution to conclude there was a fair probability that Hallman's historical and prospective CSLI could reveal evidence of a crime."  Doc. No. 92 at 6-7.

But, as the record conclusively demonstrates, the Agent did not believe, and did not intend to say in Paragraph 19, what the government urged and the Court previously inferred from that crucial sentence.  Accordingly, the Court sua sponte RECONSIDERS and VACATES the interpretation of Paragraph 19 it expressed in the May Order.  See El Fenix de P.R. v. M/Y JOHANNY, 36 F.3d 136, 139 n.2 (1st Cir. 1994) ("As a general matter, federal district judges have plenary authority to reconsider orders.").

Based on the Agent's testimony at the Franks hearing, the Court finds that the Agent had not determined the height of the suspect at the time he signed the November application.  The Court further finds that the Agent, at that time, believed Hallman was involved in the string of robberies based on the totality of facts brought to light by the investigation, including the Agent's view that Hallman's overall physical stature (meaning height and build) was generally consistent with what he saw in reports and videos related to the robberies.  Because the Court now finds that the Agent's intended interpretation, as just described, reflects the actual meaning of Paragraph 19, it ADOPTS that interpretation.[10]

---

[10] As explained above, the Court stated this interpretation at the August 16 hearing.  The government conceded to it then and, after a two-week opportunity for reflection, declined to retract its concession, suggest any changes, or express any objection.  Doc. No. 111.

This Court's decision to reconsider and revise the meaning assigned to Paragraph 19 is necessary because of the obfuscatory way the government crafted it, coupled with the manner in which it wielded this critical language in its argument to this Court.  Combined with the remainder of the affidavit (and, in particular the paragraph preceding it describing Hallman), Paragraph 19 reasonably reads as a statement that Hallman's 6'5" height and thin build <u>match</u> that of the suspect.  This is how the Court read it before hearing the Agent's testimony.  This is how the government urged the Court to read it.  This is how the Court concludes the Magistrate Judge must have read it, for doing so was a prerequisite to finding probable cause.  But, this erroneous understanding was possible only because the government omitted from the November application any clear statement of the actual meaning the Agent intended to convey in Paragraph 19.  The government failed to inform the Magistrate Judge that Hallman did <u>not</u> "match"— specifically and distinctively—the height and build of the suspect.  The government also failed to disclose to the Magistrate Judge that the Agent had not reached that conclusion and was incapable of so concluding based on the available evidence.  Indeed, the affidavit omitted disclosing that the Agent could not have determined, and did not determine, the height of the suspect at all.

This additional information is essential to accurately understand Paragraph 19.  Its omission by the government was materially misleading.  Because the November application's showing of probable cause as to Hallman rises and falls with Paragraph 19—a view expressed by the Court previously and endorsed by both parties—the omission of information critical to an understanding of that paragraph was necessarily at least reckless.  <u>Burke</u>, 405 F.3d at 81-82.

B.  <u>The Government Misled the Magistrate Judge to Think Hallman's Gait Matched That
of the Suspect by Omitting Contrary Information</u>

 The November application omitted the first nine robberies committed by the suspect

between August 2018 and March 2019, as well as the existence of the August application.[11]  In

so doing, the government hid from the Magistrate Judge reports that the suspect walked "with a

distinct limp" in October 2018 and "had a 'funny run'" in March 2019.  Doc. No. 87-4 ¶ 20(c),

(i).  These were not mere stale reports.  The suspect's limp or otherwise noteworthy gait was a

relevant, material, and fresh fact.  Although the November application described two robberies

that occurred on November 22, 2019—one week before the date the application was signed and

submitted—the government held back from the Magistrate Judge a report by one witness to the

later robbery on that date that "the suspect walked with a limp."  <u>Compare</u> Doc. No. 68-1 ¶ 7(o),

<u>with</u> Doc. No. 68-3 at 66.

The suspect's gait was always of importance to the investigation.  The Agent and other

law enforcement officers focused on the significance of a limp throughout the investigation in

2019, including <u>after</u> the November application.  The July FBI press release advised the public of

the suspect's "distinctive limp."  Doc. No. 87-1 at 1.  The August application disclosed reports

describing the suspect's gait during two robberies.  Doc. No. 87-4 ¶ 20(c), 20(i).  In September,

investigators noted Dismond, whom they labeled "Suspect" at the time, walked "with no

noticeable limp."  Doc. No 87-5 at 4.  The presence or absence of a limp remained a concern of

_____

[11] Both the August and November applications were prepared and submitted by the same Agent,
with oversight by the same AUSA.  There is no doubt that the Agent believed the same person
committed all of the robberies listed in one or both of his two affidavits.  Each application
contained his sworn statement that the same Suspect committed all robberies listed therein.  Doc.
No. 68-1 ¶ 7; Doc. No. 87-4 ¶ 20.  The Agent did not disavow these sworn statements during the
<u>Franks</u> hearing.  Nine robberies were included in both applications.  Upon Hallman's arrest, both
the FBI and the United States Attorney's Office touted the arrest of the "Inconvenient Crook," to
whom the government either then, or had previously, attributed all of the robberies.  Doc. Nos.
87-1, 87-2, 87-3.

investigators even in December, when agents questioned the mother of Hallman's child about whether she was aware of "any injuries to HALLMAN's feet, ankles, knees, hips, or legs."  Doc. No. 87-6 at 2.  That the government's investigators were continually focused on the suspect's gait underscores its significance.

According to the record before the Court, Hallman has a normal gait, including during the fall of 2019.  In the period leading up to the November application, investigators conducted substantial observations of Hallman.  On November 8, 2019, Boston police installed a pole camera facing Hallman's residence, providing them with video surveillance footage on which they could observe Hallman and assess his gait.  Doc. No. 68-1 ¶ 17; Doc. No. 82-1.  Throughout November, including on the day of the most recent robbery in which a witness reported a limp, local and federal investigators conducted physical surveillance of Hallman and his home.  Doc. No. 68-1 ¶ 18; Doc. No. 113 at 93-99; cf. Doc. No. 87-5 (logging September 2019 physical surveillance of Dismond at the residence he shares with Hallman).  The record contains no evidence that investigators ever observed a limp, a "funny run," or anything otherwise distinctive about Hallman's gait.  To the contrary, there is evidence before the Court—the Agent's Franks hearing testimony—establishing that investigators observed nothing noteworthy about Hallman's gait during their own significant surveillance:

> Q:     At any point, did either you or a member of your team note that Mr. Hallman had a limp?
>
> A:     No.
>
> *     *     *
>
> Q:     At any point did either you or a member of your team, so far as you know . . . observe that Mr. Hallman had a funny way of walking?
>
> A:     No.

> Q:    At any point, did either you, personally, or a member of your team, so far as you're aware, observe Mr. Hallman to have any distinctive manner of walking whatsoever?
>
> A:    No.

Doc. No. 113 at 99.[12]

Thus, the November application never told the Magistrate Judge: 1) that witnesses to multiple robberies (including very recently) had reported the suspect sometimes exhibited a limp or "funny" gait; 2) that investigators remained focused on the suspect's gait throughout their investigation, including around and after the time of the November application; and 3) that investigators never observed Hallman with an unusual gait despite substantial opportunities to observe him.  In other words, the investigators had evidence Hallman walked "normally" and the suspect at times did not, but the government withheld these facts from the Magistrate Judge.

In holding back this information from the Magistrate Judge, it appears the government acted purposefully and carefully.  The information regarding gait was neither peripheral nor stale.  Much of the November application was copied verbatim from the August application.  Yet the government has been unable to explain why it omitted any reference to the August application or why it decided to start the November application with the May 2019 robbery (a decision which, in practice, ensured the two earlier robberies featuring descriptions of the suspect's gait would be excluded).  Cf. Doc. No. 113 at 68-73 (reflecting agent's testimony that "investigatively" he "came to a determination" and "felt confident" that the robberies from May through November 2019 were committed by the same person, offering no concrete reason for lacking "the same level of confidence" as to earlier robberies, and admitting he had access to

---

[12] This unambiguous exchange belies the government's later suggestion that "[t]here's no evidence whether Mr. Hallman has a limp or doesn't have a limp," and that "[t]he only statement about he doesn't have a limp was presented by [defense counsel], not sworn testimony."  Doc. No. 109 at 21.

video surveillance of at least some earlier robberies).  The government has <u>not</u> contended that the earlier robberies were committed by a different person or that its prior sworn assertions that the same person committed all of these robberies had been reconsidered as of November 2019.  The record provides no real explanation for the government's decision regarding the earliest robbery it chose to include in the November application.

The government <u>did</u> explain its omission of the witness report describing a limp during the last robbery included in the November application.  In particular, the government justifies this decision by asserting the application only included information the Agent could corroborate through his review of surveillance videos and images.  Doc. No. 113 at 51-54.  Based on this review, the Agent opined that he did not believe the suspect walked with a limp in footage related to the last robbery.  <u>Id.</u> at 40-43, 49.  But, the government withheld this principle from the Magistrate Judge.  It never disclosed that information provided by witnesses or local law enforcement, but "uncorroborated" by the Agent's own review, was excluded from the submission (or that such information existed at all).  Instead, the November application expressly represented that it included "information obtained from other agents <u>and witnesses</u>."  Doc. No. 68-1 ¶ 6 (emphasis added); <u>see id.</u> ¶ 7 (basing conclusion that the same person committed all listed robberies "on both video surveillance <u>and witness statements</u>" (emphasis added)).

In other words, though the November application told the Magistrate Judge that it was based, in part, on witness statements, the government now says it included only those facts the Agent could discern from the videos and photographs he reviewed.  In these circumstances, the government's failure to disclose to the Magistrate Judge the guiding principle it has now articulated is itself a materially misleading omission, if true.  Of course, the record before the

Court suggests the Agent <u>did</u> include some facts from witnesses uncorroborated by video.[13]

Even if the government meant only that the Agent rejected this particular witness report based on

his review of the relevant videos, it still misled the Magistrate Judge in this case by failing to

either reveal this specific determination or disclose more generally that the Agent possessed but

had rejected contrary witness information.

Finally, the government's conduct before the Court shows a studious effort to withhold

from the Magistrate Judge information regarding gait.  Before this Court, the government has

taken various positions regarding why it omitted statements referencing the suspect's gait from

the November application.  Originally, the AUSA represented that the limp (and the July 2019

press release referencing it) had "nothing to do with this case" and solely related to a 2018

robbery which the government "did not tie to [Hallman's alleged] string of robberies."  Doc. No.

89 at 36, 54.  Indeed, the AUSA even claimed he was "flummoxed" by the "great leap" Hallman

had made in arguing the limp and the press release were relevant.  <u>Id.</u> at 54, 56.  The government

later conceded that its earlier position had been mistaken, calling it "somewhat of an

overstatement."  Doc. No. 113 at 6-7.  The government's revised stance is essentially that, in

November, the investigation was in "a different phase," Doc. No. 113 at 71, and by then "the

limp was almost insignificant," Doc. No. 109 at 9.[14]  This, however, is unexplained by the record

and contradicted by the facts.

---

[13] <u>E.g.,</u> Doc. No. 68-1 ¶ 7(d) (stating that "$6 [was taken] from the victim attendant's wallet" in
addition to money taken from the cash register, though the only video offered into evidence
depicting the relevant robbery includes no view of the register, the victim, or the wallet); <u>id.</u>
¶ 7(e) (stating the robber wore "a black hooded sweatshirt, . . . black pants, grey gloves," and
carried "a black and silver handgun," though the only video offered into evidence depicting the
relevant robbery was black-and-white).

[14] Though the AUSA told the Court at the August 16 hearing that "there was a reason" the
government "did not mention the limp" in the November application, he said he "need[ed] to just
research that before [he] ma[d]e a statement why [the government] did not discuss the limp."

Furthermore, because the government elected to seek the November warrant over the Thanksgiving holiday weekend, the application (properly) went to the duty Magistrate Judge, and not to the Magistrate Judge who reviewed the August application.  Because the government had eliminated all reference to the suspect's gait and did not disclose the August application, the duty Magistrate Judge had no way of knowing these omitted facts when considering the November application.  Later, when the government sought a criminal complaint against Hallman and authorization to search his residence, it did not return to the original Magistrate Judge, but instead presented its requests to the second Magistrate Judge.  This was plainly in violation of the rules governing practice before the Magistrate Judges of this Court.  Rule 15(d)(1) of the Local Magistrate Rules provides (as it has for years):

> If, on a previous occasion, [a magistrate judge] has issued a search warrant . . . in connection with an ongoing investigation, subsequent applications for . . . search warrants . . . must be made to [that same magistrate judge], unless the new application or matter is not directly related to the previous investigation.

Thus, the government was <u>required</u> to return to the first Magistrate Judge—i.e., the one who had signed the warrant in August (and who was aware of the limp)—and not to the Magistrate Judge who had been on emergency duty over the holiday weekend when the November application was made (who was unaware of the limp).  Nothing suggests this was mere oversight by an inexperienced AUSA.

Along with an application for a criminal complaint, the government must complete and submit a JS-45 form.  The same rule referenced above requires the government to record on the

---

Doc. No. 109 at 9.  So, with his supervisor present in the courtroom, the AUSA asked for "further time to sort of review" the case before addressing that question.  <u>Id.</u>  The Court accommodated his request.  <u>Id.</u> at 23-24.  At the end of the two weeks provided, the government notified the Court it would "not file any supplemental submissions," Doc. No. 111, thus never offering the "reason."

JS-45 "the docket or case number(s) of [all] prior proceedings" in connection with the underlying investigation.  D. Mass. L. Mag. R. 15(d)(1).  This means the AUSA must list the case number of every prior search warrant issued in the course of the criminal investigation.  The JS-45 form itself requires the AUSA submitting it to certify "that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth."  Here, the government submitted a JS-45 form and certified that it had accurately set forth the appropriate case numbers, <u>but it omitted any reference to the August warrant application</u>.  Doc. No. 4-2; Doc. No. 13-1.  When confronted with this omission, the government had a ready explanation: it "just didn't have enough room" on the form to include the August warrant.  Doc. No. 113 at 135.  But that is simply not true. The form had ample space for one more number, Doc. No. 4-2, and (as the government well knows) AUSAs routinely attach a separate sheet when necessary.

Accordingly, the Court finds and determines that the government <u>at least</u> recklessly omitted the following material facts from the November application: 1) that some witnesses at the beginning, middle, and end of the string of robberies attributed to the suspect reported a limp or otherwise distinctive gait; 2) that investigators focused on the gait of possible suspects throughout their investigation, including after Hallman's arrest; and 3) that Hallman, in contrast to these witness reports, never exhibited a limp or distinctive gait.  The Court further finds and determines that the government studiously hid these facts, as well as the existence of the August application, from the Magistrate Judge.  These omitted facts concern one of the only distinctive descriptors in the mix in a case where the question of probable cause was a close one.  <u>See</u> <u>Burke</u>, 405 F.3d at 81-82.

C. <u>The Government Misled the Magistrate Judge to Believe the Suspect, like Hallman, Was Distinctively Tall by Omitting Contrary Information</u>

The November application contained no information whatsoever regarding the height of the suspect. Likewise, it provided no description of the suspect's build beyond an assertion that the person committing each robbery had the "same build." Doc. No. 68-1 ¶ 7. Hallman centered his focus on information contained in a police report describing the September 21, 2019 robbery of the Everest Market. Doc. No. 68 at 10. In that report, a local police officer who had spoken with the clerk present during the robbery and had also reviewed surveillance footage, described the suspect as "approximately 5'10", 190 lbs." Doc. No. 68-3 at 40. The government omitted this information from the November application.

Hallman is very tall and thin. He has been described this way by the government many times, <u>see, e.g.</u>, Doc. No. 89 at 20 (arguing "Hallman was distinctively tall"), and the Court's observations of him in the courtroom confirm those characterizations.[15] In the November application, the only specific height the government elected to provide was in its description of Hallman as approximately 6'5", based on observations made of him during physical surveillance of his residence. Doc. No. 68-1 ¶ 18. As the government has repeatedly emphasized, most people would probably view a man who is 6'5" not simply as "tall," but as remarkably or unusually tall. Thus, a height of 6'5" is a distinctive characteristic that could meaningfully narrow the field of robbery suspects and would factor strongly into an assessment of probable cause. By including this specific estimate of Hallman's height and then likening his "overall appearance" to that of the suspect, the November application capitalizes on this distinctive

---

[15] The government's reliance throughout this case on Hallman being distinctively tall highlights the significance of this fact to the overall probable cause analysis. <u>E.g.</u>, Doc. No. 18 at 6, 12 (reflecting preliminary hearing testimony offered by government describing robbery suspect as "significantly tall" and Hallman as "extremely tall").

quality.  Indeed, as this Court's (now vacated) May Order demonstrates, the language the

government chose to use in the November application was reasonably read as suggesting the

suspect in each robbery was approximately 6'5" (i.e., distinctively tall).

The government, however, has no supporting facts.  The Agent said he could not, and did

not, determine height from the video surveillance.  Not a single witness statement in any police

report before the Court characterizes the suspect as "distinctively" or "unusually" or "extremely"

tall.  Indeed, none of the reports offered as exhibits by the government even include a height

estimate for the suspect of 6'5" or 6'6" (the heights the government has on different occasions

attributed to Hallman, Doc. No. 68-1 ¶ 18; Doc. No. 68-2 ¶ 20(b)).  Rather, the reports reflect

that witness descriptions of the suspect's heights varied, from a low of 5'10" to a high of 6'4",

with most reports giving estimates somewhere in between, and some providing no height

information at all.[16]

Of course, as noted, the Agent (who believed Hallman was the suspect) explained that he

provided descriptive information in the November application only if he could corroborate it by

reviewing surveillance photos and videos.  But, again, the government did not explain that

approach to the Magistrate Judge, nor did it provide any photos or videos to aid in the Magistrate

Judge's assessment of the government's probable cause showing.  Cf. Brunette, 256 F.3d at 19

---

[16] The Court focuses here on height, as that is the feature of Hallman's physical appearance the
government has characterized as distinctive.  It also notes, however, that the police reports
provided by the government do not uniformly describe a Suspect with a thin build (and, as the
November application, makes clear, Hallman is "skinnier" than his "thin" brother, Doc. No. 68-1
¶¶ 14, 18).  Only about half of the reports describe the suspect as "thin," two allow for the
possibility of a "medium" build, and the September report gives a height and weight (5'10" and
190 pounds) that would render a person overweight.  See Centers for Disease Control &
Prevention, "Healthy Weight, Nutrition, and Physical Activity: Adult BMI Calculator,"
http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calcula
tor.html (last visited Oct. 4, 2021) (estimating body mass index of 27.3 for an adult who is 5'10"
and weighs 190 pounds, and defining "overweight" as including BMIs between 25 and 29.9).

(finding warrant was issued in error where there had been no "independent review of the images, or at least some assessment based on a reasonably specific description" of the facts supporting the agent's belief they were lascivious).  Moreover, it did not disclose that the Agent was unable to determine the suspect's height, let alone conclusively match it to Hallman's, by viewing the videos.

In light of the omitted witness statements and the Agent's concessions at the <u>Franks</u> hearing regarding height assessments, the Court concludes that the November application was materially misleading as to the suspect's height.[17]  After reviewing the November application—and by virtue of the government's omissions coupled with the information it did artfully provide—the Magistrate Judge was almost certainly left with the impression that the suspect observed by witnesses and on surveillance footage in each instance was not only tall and thin, but roughly <u>as (distinctively) tall</u> and <u>as thin</u> as Hallman.  In a case where descriptive information about the suspect was limited due to the manner in which the robberies were committed, and where the question of probable cause was a close one at best, the government's wholesale omission of information provided by witnesses about the suspect's height and build recklessly misled the Magistrate Judge.[18]  <u>Burke</u>, 405 F.3d at 81-82.

---

[17] This is so even if the Agent had a reasonable basis for discounting the September 2019 description (5'10", 190 pounds) as an outlier.  The other reports, considered together, reflect a degree of variation in witness descriptions of height and build that is meaningfully different than the impression conveyed by the November application.

[18] The materially misleading nature of the government's omission of descriptions of the suspect's height and build is tied to the facts presented in this case.  Here, information about the suspect was limited, with the most distinctive descriptors in the mix being Hallman's height and the suspect's possible limp.  The Court's determination on these facts does not mean omitted references to a limp or estimates of height would always be material.  It is a determination based on the specific facts presented in this case.

D.  The Reformed Application and Probable Cause

Having concluded that the November application was at least recklessly misleading in the wording of Paragraph 19, the omission of reports about the suspect's gait, and the omission of witness descriptions of the suspect's height and build,[19] the Court must now consider whether "the omitted information, if incorporated into the affidavit, [is] sufficient to vitiate probable cause."  United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015).  To put it another way, the Court must ask whether the affidavit, once reformed to include the omitted information, establishes probable cause to believe that evidence of a crime would be found in Hallman's CSLI.  See United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013) (explaining suppression is warranted if, "with the recklessly omitted information added to the affidavit, the reformed affidavit fails to establish probable cause").  "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found at a particular place.'"  United States v. Torres-Rosario, 588 F. Supp. 2d 128, 131 (D. Mass. 2008) (quoting Gates, 462 U.S. at 238).  Although a search warrant is ordinarily reviewed with deference to the issuing magistrate, no such deference is owed where, as here, the warrant was procured with reckless or intentional misstatements of fact.  Gifford, 727 F.3d at 99.

The Court begins by reviewing the allegations contained in the reformed November warrant application.  As reformed, the application provides all of the facts listed above, supra at

---

[19] Hallman argues the application for the November warrant omitted or misstated several other minor details.  As to his challenge arising from one report's description of the color of the suspect's gun, the evidence produced at the Franks hearing established that the Agent did not act recklessly in disregarding this report.  The relevant surveillance images supply a reasonable basis for concluding that the handgun used in the relevant robbery was silver and black (not brown).  Because Hallman did not seek to develop any evidence at the Franks hearing regarding other facts, the Court finds he has not met his burden as to the remaining misstatements and omissions raised in his papers.  Arias, 848 F.3d at 510-11.

10-11, to which the parties have assented both expressly during the August 16 hearing and by not challenging them thereafter.[20]  To that list, in light of the omissions the Court has found, the following facts are now added:[21]

- Paragraph 19 expresses the affiant's belief that Hallman was involved in the string of robberies based on the totality of facts brought to light by the investigation, including his view that Hallman's overall physical stature (meaning height and build) was consistent with what he saw in reports and videos related to the robberies.

- In the last robbery described in the November application, a witness reported that the suspect walked with a limp.

- Nine robberies occurred prior to those listed in the affidavit, spanning the period from August 2018 to March 2019, and were attributed to the same suspect.

- In two of the earlier robberies, it was reported that the suspect walked with a "limp" or had a "funny run."

- The November application does not assert that Hallman walks with a limp, and investigators who observed him during surveillance, including around the time of the last robbery, have never noticed anything distinctive about his gait.

- No witness to any robbery described the suspect as being 6'5" or taller, nor did any witness describe the suspect as being "extremely" or "distinctively" or "unusually" tall.

- Witnesses to many robberies provided specific estimates or ranges that they believed described the suspect's height; most estimates were between 6' and 6'4", and in five robberies the estimates were between 6' and 6'2".

- A witness to one robbery described the suspect as 5'10" and 190 pounds, though the affiant determined during his visit to the location of that robbery that the witness's height estimate was inaccurate.

- The affiant was unable to assess height by watching the surveillance videos and has not identified an investigative basis for discrediting any other witness's height or build estimate (including one witness's description of the suspect as 6' with a medium build).

---

[20] Both sides were given an opportunity to address the facts listed by the Court in a written post-argument submission.  Doc. No. 109 at 23-24.  Both declined to do so.  Doc. Nos. 111, 112.

[21] The Court included the first five bulleted facts listed here when describing the universe of relevant facts for the parties during the August 16 hearing, and neither party objected or sought to alter them in any way.  Doc. No. 109 at 5-7.

After much consideration, the Court concludes that these facts are insufficient to establish probable cause to believe Hallman was involved in the robberies and, thus, that his CSLI would reveal evidence of a crime.  From the start of these suppression proceedings, the Court has understood that "the whole nexus between Hallman and the robberies" for purposes of assessing probable cause "comes down to that one sentence in paragraph 19."  Doc. No. 89 at 17; see Doc. No. 114 at 12 (characterizing Paragraph 19 as the "load-bearing paragraph" of the affidavit with respect to Hallman).  Without Paragraph 19, all the November application has to say about Hallman is that Dismond, who is connected to the car used in the charged robbery, is his brother; the two brothers live together and are often seen together; Hallman, at 6'5", is taller and thinner than Dismond (who also is tall and thin); and Hallman sometimes wears red-and-black sneakers, as has the suspect in many (but not all) of the robberies.

The Court remains of the view that these facts, without more, cannot support a finding of probable cause.  Plainly, on these facts, Hallman's relationship with Dismond alone is not enough.  Ybarra v. Illinois, 444 US 85, 91 (1979).  The government has never contended otherwise.  Nor does the government gain much by alleging a difference in height and build between the two tall thin men (without any attempt to quantify or further describe that difference and how it impacts a comparison between the men and the suspect), and noting Hallman has sneakers that are similar to those sometimes worn by the suspect (without offering any basis for finding that such sneakers are sufficiently distinctive to provide a meaningful link between Hallman and the crimes).  Cf. United States v. Johnson, No. 19-cr-0139, 2019 WL 6251282, *2 (N.D. Cal. Nov. 22, 2019) (finding "affidavit did little to narrow the pool of suspects" where belief that defendant was one of three robbers relied on consistent build, absent basis to find build was distinctive, and established ties to other two suspects).

With Paragraph 19 added to the mix, and interpreting it in light of the Agent's testimony, one learns that Hallman's overall physical stature is consistent with that of the suspect described in police reports and depicted in surveillance footage of the robberies.  If that were the end of the story, the probable cause analysis here might remain a close question.[22]  But the reformed affidavit provides more information—information that weakens, rather than supports, the government's application.  On at least several occasions, victims or other witnesses described the suspect as being several inches shorter than Hallman is, attributing to the suspect heights that are "tall," but not distinctively so.  Three times, the suspect the government believes is responsible for this series of robberies was described by victims or other eyewitnesses as walking with a limp or in an otherwise idiosyncratic manner—a quality investigators do not attribute to Hallman, but arguably the most distinctive characteristic attributed by witnesses to the suspect.[23]  Cf. Grant v. City of New York, No. 15-cv-3635, 2019 WL 1099945, at *6 (E.D.N.Y. Mar. 8, 2019) (finding fact that individual "walks with a limp or gait which the suspect did not have" was a material factor in a probable cause analysis).

In these circumstances, the application—correctly understood and reformed as necessary—conveys the investigators' hunch that Hallman had something to do with the robberies, but it does not establish probable cause supporting the government's request for Hallman's CSLI.  This conclusion is only underscored by the government's failure to cite a

---

[22] Hallman has argued, with some justification, that Paragraph 19 was too vague to aid in the probable cause determination.  Doc. No. 68 at 16.  The government's own evolving reading of the statement only emphasizes Hallman's point.

[23] The government's suggestion that reports of a limp were insignificant is wrong.  It bears on the assertion that all robberies were committed by the same person, as well as on the nexus between the suspect and Hallman.  Moreover, the government's contention is undermined by the government's own focus on the limp at various times throughout its investigation, and by the lengths to which the government appears to have gone in an effort to conceal that information from the Magistrate Judge.

single case finding probable cause on facts as sparse as those it has provided, as well as its

inability to articulate a cogent explanation for why this Court should find probable cause here.[24]

      After the government agreed the Court had accurately stated the relevant facts at the

August 16 hearing, the Court asked the government to address "the 64,000-dollar question,

probable cause."  Doc. No. 109 at 9-10.  The government responded that the application "more

than established it."  Id. at 10.  The Court asked, "[w]hy?"  Id.  The government said "all of those

factors, when put together, suggest that Mr. Hallman was involved in the robbery."  Id.  The

Court persisted, saying the government had just offered "a conclusion," but had not provided

"any insight" into "what [it is] about this set of facts that" would lead "a reasonably prudent

person" to "believe that there would be evidence . . . of this crime" in Hallman's CSLI.  Id. at 10-

12.  The government never provided a response to the Court's question.  See id. at 12-14

(digressing, then repeating twice a conclusory assertion that "the affidavit established sufficient

probable cause").  Though the Court provided time for the government to supplement its

presentation—at the government's own request—the government made no additional filing.

Doc. No. 111.  In other words, the government left the August 16 hearing, having heard the

Court's recitation of relevant facts and its questions about probable cause, and elected not to

elaborate on its prior submissions in any way despite two weeks to review and reflect.  Thus, the

---

[24] It is worth emphasizing that the Court cannot simply "rubber stamp" the government's confident but conclusory assertion that it believes probable cause exists.  United States v. Leon, 468 U.S. 897, 913-14 (1984).  The Court must engage in an independent assessment of the sufficiency of the government's showing in support of the request.  See Brunette, 256 F.3d at 17-19 (finding government had linked certain images to the defendant, but affiant's "bare legal assertion" that images were pornographic "was insufficient to sustain the magistrate judge's determination of probable cause" where affiant had not described in "any detail the basis" for his conclusion or provided copies of the images for the magistrate's "independent review").  The sparser the details supplied by the government, the higher the risk that the Court will be unable to meaningfully evaluate the showing of probable cause.

government essentially relinquished its opportunity to advance any non-conclusory argument based in law or in fact that the November application—considered in light of the evidence amassed throughout the proceedings arising from Hallman's suppression motion—established probable cause supporting a search of Hallman's CSLI.[25]

In the unusual circumstances presented by this case, the Court concludes that the November application failed to establish probable cause to search Hallman's CSLI. Relying on little more than selective and conclusory statements about what the affiant believed, the application at its core expressed no more than a hunch on the part of investigators about Hallman's involvement in the crimes described. As the First Circuit has cautioned, "[g]ood hunches are the foundation of good police work, but they are not probable cause." United States v. Chadwick, 532 F.2d 773, 785 (1st Cir. 1976).

IV.    CONCLUSION

Hallman's Motion to Suppress (Doc. No. 68) is ALLOWED. Any and all evidence derived from the search of Hallman's CSLI made pursuant to the November warrant—including

---

[25] The government's failure to engage with the probable cause question at and after the August 16 hearing bookends its approach to crafting the November 16 application. On the application form, when asked to identify the "basis for the search" it wished to conduct, the government selected only one of the four options provided: "a person to be arrested or a person who is unlawfully restrained." Doc. No. 68-1 at 6-8. It did not select any of the three options expressly aimed at discovering evidence related to a crime. It made the same designation three times, on three separate sheets associated with the November warrant application. Id. The government dismissed the relevance of its selection, characterizing it as a simple mistake. Doc. No. 89 at 27. But it never corrected its "error"—which was repeated elsewhere in the application packet, id. at 27-28—and the content of the affidavit echoes the selection the government made on the application forms. See Doc. No. 68-1 ¶ 20 (suggesting warrants are sought to "assist the [investigators] in locating" Dismond and Hallman); id. ¶ 23 (expressing belief that the warrants sought "will drastically increase the chances of locating" Hallman and Dismond). Rather than unambiguously asserting that the affiant believed there was probable cause to think the CSLI would provide evidence of a crime, the affidavit says historical CSLI is "necessary for investigators to determine" whether Hallman or Dismond was located near any of the armed robberies. Id. ¶ 21 (emphasis added).

the fruits of the subsequent search of Hallman's home, which was conducted pursuant to a warrant obtained using the unlawfully obtained CSLI[26]—is SUPPRESSED.

The Court will hold an initial pretrial conference in this matter on October 13, 2021 at 4:15 PM by video.  No later than October 12, 2021, the parties shall file a joint status report setting forth their joint or separate positions as to: a) time periods already excluded under the Speedy Trial Act; b) time not yet excluded that ought be excluded under the Speedy Trial Act; and c) the days remaining under the Speedy Trial Act.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

---

[26] Hallman expressly sought suppression of "the fruits of a subsequent search warrant of Hallman's home, which incorporated and was based on [Hallman's cell-site] location information."  Doc. No. 68 at 1, 25; see Doc. No. 68-2 at 18-20 (summarizing in the December warrant application the CSLI obtained via the November warrant).  The government opposed the motion but advanced no separate argument that evidence uncovered during the December search of Hallman's home should be carved out of an order allowing Hallman's motion and suppressing the CSLI seized via the November warrant.  See generally Doc. No. 80.